Thank you. Could I have the attorneys who are going to be presenting approach the bench and identify yourselves for the record, please? Good morning, Your Honors. I am Assistant Appellate Defender Rachel Moran, and I represent Oscar Flores. Good morning, Assistant State Attorney Peter Maltese, on behalf of the people. Thank you. All right, so we'll have 15 minutes aside. Ms. Moran, do you want to save some time for rebuttal? Yes, Your Honor. If I can save three minutes for rebuttal. That's fine. You may proceed. Good morning, Your Honors, and may it please the Court. As Your Honors are aware, I raised a number of issues in my briefs in this case. I intend to focus on issues one and two, but I would welcome this Court's guidance on whatever it wants to address. Your Honors, the strongest and practically only evidence against Oscar at trial was his confession. It is undisputed that Chicago Police detectives first obtained this confession illegally in May of 2007, and that Oscar parroted back the same confession when he was rearrested in July. Although Oscar moved to suppress all confessions, the Court suppressed only the May statement, and then informed Oscar that he could not even mention the May interrogation at trial. The Court's ruling effectively rewarded the detective's misconduct by allowing the final confession to be used against him, but preventing the jury from hearing why it was not reliable. This Court should reverse Oscar's convictions and remand for a new trial, because the Court erred in failing to suppress the July statement to ASA Shepard. Even if the July statement was properly admitted, the Court's mid-trial decision to bar Oscar from explaining why he confessed violated his fundamental right to present the circumstances surrounding his confession. Turning to the first issue, Oscar has provided this Court with a variety of reasons why the July confession should have been suppressed, but I'd like to briefly focus on three of these in oral argument today. The first is that the July confession was obtained in violation of Oscar's right to remain silent. When Oscar was re-arrested in July and brought back to the same interrogation room and interrogated by the same detective, he was read his rights and acknowledged them, and then Detective Swideric said that Robert Macias, quote, has been saying some things about you, and we wanted to talk to you about them. You want to talk to us about that? Oscar responded, not really, no. Not really, no. And the State has this transcript where they say, no, not really. Does it make a difference, Ms. Moran? And if not, why not? Well, Your Honor, if I can first address this, I think it's undisputed that the video itself is the actual evidence, and that's how it was treated at trial. The transcript is helpful. It's like a demonstrative evidence, but it's not the substantive evidence, and the video itself says, not really, no. So that should, of course, be this court's, that's the actual evidence, is that he said not really, no. No, that is the actual evidence. What I'm asking you, though, is there a difference between the two if it's said the other way? Is one more unequivocal or more equivocal? What do you think? Or does it matter? I don't think it matters. I think the phrase no is unambiguous regardless. But if anything, what he actually said is stronger. Because a court, I suppose, could read it as the not really, if that was defining the no, then that could perhaps be more ambiguous than what he actually said, which is not really no. But either way, it's an unequivocal no to the question, do you want to talk to us? And that is an invocation of the right to remain silent. And based on that alone, his confession should have been suppressed. As well as the following confession to A.S.A. Shepard, because it's undisputed that Detective Swideric did not scrupulously honor his right to remain silent. The state did not even present an attenuation argument in its brief and has effectively conceded that point. So if not really no is an unambiguous invocation of the right to remain silent, the confession must be suppressed. And People v. Hernandez from this court in 2005, as well as In Re R.C. from the Illinois Supreme Court, are the two most helpful cases on this point. In Hernandez, the A.S.A. very similarly read the defendant in his rights and asked if he wanted to talk and the defendant said no. The A.S.A. then attempted to clarify and this court held that the attempt to clarify or to continue the questioning was improper. In Re R.C., the detective did very similarly to what Detective Swideric here. After the defendant said he didn't want to talk with the detective, the detective said, okay, well, you have that right, but there is evidence against you. And that's extremely similar to what Swideric did here, which is pause. He didn't remind Oscar that he had the right to remain silent, but then said, okay, but Macias is saying things that aren't good about you. The Supreme Court said that that's obviously an attempt to induce the defendant to waive the right he had just invoked, and that's improper. Another independent reason the July confession should have been suppressed is that it was obtained in violation of his May request for counsel. And this is an issue of first impression, which was issue 1B1 in the briefs, as to whether the Maryland v. Chatser exception applies. When the request for counsel was made earlier, there was a break in custody, but the request for counsel is not honored in the first interrogation. But hasn't that case been interpreted to mean that once two weeks have passed that that request is pretty much obviated or no longer standing? Yes, but never in this context, Your Honor. Edwards v. Arizona is the per se rule, or until Chatser was a per se rule, saying that when a defendant invokes his right, makes a request for counsel, and that counsel is not provided, the detectives cannot reinitiate interrogation at any point unless counsel is provided. Chatser created an exception to that rule, and Your Honor is absolutely right. Chatser held that when there's at least a two-week break in custody, which we would acknowledge is satisfied here, that the detectives can re-read Miranda and reinitiate interrogation. But Chatser specifically relied on the fact that the defendant would know that he only need demand counsel to bring the interrogation to a halt. That's because in Chatser, the initial request for counsel, although counsel wasn't provided, the interrogation was immediately stopped. Here, that exception doesn't apply because the detectives ignored that request for counsel and continued the interrogation without ever providing counsel. So where the Chatser, the reasoning behind Chatser does not apply to this case, this Court should fall back on the per se rule laid out in Edwards v. Arizona. As far as the later statement to the Assistant State's Attorney, what are the four things the Court's looking at to decide whether there's been a subsequent waiver of the invocation of the right? Your Honor, there are two different tests that I found in Illinois law, and I laid out both. Dennis, People v. Dennis is in the opening brief, and then People v. Kolakowski is in the reply brief. In Dennis, the Court said there are four factors. The first is whether Miranda warnings were given during the subsequent interrogation. The second is the presence of intervening circumstances. Third, the proximity and time between the two confessions. And fourth, the purpose or flagrancy of the misconduct. However, in Kolakowski, Dennis dealt with a situation similar to this, in which it was an involuntary confession and then a subsequent confession. However, in Kolakowski, this Court actually used slightly different factors. Yes, those are that there's fresh Miranda. There is a lapse of time. The fourth is whether they question about the same statement or another, although that's not defining one way or the other. And what's the other factor? Kolakowski actually said that the three factors are the time that passes between the interrogations, the change in identity of the interrogators, and the change in identity of the interrogators. There seem to be two different kinds of tests used. If we look at the Kolakowski test, yes, we would acknowledge there's certainly time passed between the confessions, but there's no change in identity of the interrogators. Is there a separate test for the invocation of the right to counsel? I think the four factors are slightly different for that. For the invocation of the right to counsel, as far as attenuation goes, the factors are the same. If that's what Your Honor is referencing, the attenuation factors are the same between the right to counsel and the right to remain silent. I think they're slightly different, but go ahead with your argument. Your Honor, the State has not argued that there's an attenuation between the July statement and ASA Shepard, so that should not be an issue in this case. Briefly, Your Honor. Well, the State's going to tell us that Schatzer applies because if you look at the underlying reasoning of Schatzer, you've taken the suspect out of the coercive atmosphere of the police station and the custodial situation, and he's returned to normalcy. He's returned to his normal life, and so if a significant period of time passes and then he goes back into custody, it's less likely that his decision to speak is the result of the coercive atmosphere of the custodial situation. Your Honor, that is one of the two reasons in Schatzer, and we would acknowledge that that reason was somewhat satisfied in this case in that Oscar did have seven weeks. But when Oscar is brought back by the same detectives, brought to the same interrogation room in May, he is reminded specifically by the detective who didn't want him to forget what had happened in May, and that detective said, remember what happened last time and you walked out of here a free man. Remember what you told us last time and, quote, everything was cool, and then suggested that he tell the same story. Then I think that any break in custody that Oscar had, he was quickly reminded of how coercive that experience had been seven weeks earlier. So even the one factor that State argues does apply in Schatzer really shouldn't be satisfied here. But the other half of Schatzer was that the defendant would know all he has to do is invoke his right to counsel and the interrogation would cease. And that is clearly not satisfied in this case because when he invoked his right to counsel, the interrogation continued for another more than 24 hours. So Schatzer really shouldn't apply to this case. The last reason the confession should be suppressed is because it was involuntary. The State has not attempted to contest the, or to defend the detective's actions in May. They have not contested the fact that the detectives threatened Oscar, swore at him, lied to him, misstated the evidence, misstated the law. You're talking about May again. I am, Your Honor. The reason that May is something worth looking at is because of this Court's decision in Kalikowsky that has said that when an initial confession is involuntary, that is a factor in determining whether a subsequent confession is tainted by that initial coercion. The State would have this Court ignore it as moot. But in Kalikowsky, was there a time frame break? Like months? May, then a re-arrest, and then a subsequent statement? No, Your Honor, there wasn't. Certainly there wasn't seven weeks. And this is longer. But particularly where that first experience is so coercive and where the detective, even though there is a seven-week break, when the detective himself wants Oscar to remember that first coercive experience, reminds Oscar, remember what happened last time, and suggests that he should provide the same story, then even the State's position that that earlier interrogation is simply moot. The first interrogation in May, the trial judge suppressed that based on a right of counsel, asking for counsel and that being ignored. Yes. But that is still a factor in determining whether the subsequent confession seven weeks later is voluntary. In People v. Taylor, the Illinois Supreme Court held that the State has a, quote, heavy burden of proving that a subsequent statement is sufficiently attenuated from an earlier illegal statement. How do you respond to the State's suggestions that he kept talking, he responded to their questions, and there was somewhat of an equivocation then regarding this request that he didn't really want to talk? Well, it's just wrong, Your Honor. The trial court was wrong and the State is wrong. If Your Honors have an opportunity or already have to look at the video, he didn't keep talking. You suggest, Ms. Moran, that we're going to review this de novo. Is that because the court was essentially given the DVD and said, here, take a look at this? Neither the defendant didn't testify at an open hearing, and no detective testified at an open hearing, and no detective was called by either side. So you've suggested that we're going to look at this, or we should look at it, completely anew. Yes, Your Honor. That is an unusual situation, but the trial court's ruling was based entirely on documentary evidence, entirely on the video, and this court has equal access to the exact same evidence the trial court had. So this isn't a situation where there's a deference to the credibility findings of a judge who is watching a witness on the stand. Of course, in that case, there's a difference, but in this case, we would acknowledge that the factual findings should be reviewed for manifest error. But in this case, the factual findings were based entirely on the court's own observations of the video that this court has equal access to. So in this situation, under People v. Howerton, it should be, the entire thing should be reviewed de novo. Counsel, I have a question regarding the videotapes. The trial court viewed the videotapes from a July interview. Did the trial court have an opportunity to view the videotapes from the May interview as well? Yes, Your Honor. The trial court viewed presumably extensive portions of the May video. We know that the trial court said she viewed the relevant portions, and she suppressed the May statement. She also reviewed the July video later. Turning to the second issue, even if this court finds that the July confession should not have been suppressed, at a minimum, the trial court grossly restricted Oscar's constitutional right to present a defense when it prevented him from explaining why he gave the July confession. Prior to the first day of trial, this issue was heavily litigated, and the court, I would say, gave wavering rulings on the issue, but the court had repeatedly told defense counsel that it would allow Oscar to testify about the May interrogation as long as his testimony fell within an exception to the hearsay rule. The court changed its position on the second day of trial and announced to defense counsel that the jury would hear, quote, not a word about the May interrogation. The court's reasoning seems to have been that evidence about the May interrogation was hearsay. The court's reasoning is flawed because defense counsel repeatedly told the court that she was primarily offering clips of the May interrogation, portions of that interrogation, to show what the detectives were doing, not what Oscar was doing, and that they were offered to show the effect on the listener, which is not hearsay. You don't need to find a hearsay exception. What is it? You don't think it's hearsay and then an exception because you're basically reporting statements made somewhat out of court. So how is it basically hearsay, even though you're saying it's not being offered for the truth? Well, Your Honor, under 801 rule of evidence, 801C, hearsay is an out-of-court statement that is offered for its truth. So the use that Oscar was attempting to make was clearly not for the truth of the matter. Exactly. And so it was clearly outside of the hearsay definition altogether. In Crane v. Kentucky, the United States Supreme Court said that apart from the issue of voluntariness, the defendant still has a right, even if the trial court made a pre-trial ruling that a confession is voluntary, the defendant still has a fundamental constitutional right to explain why he gave that confession and to present the jury with evidence suggesting that the confession was not credible, not reliable. And in People v. Mellock, the Illinois Supreme Court reiterated the Crane ruling and said that when the defendant has every opportunity to convert the state, to controvert the state's proof, and a defendant has a right to familiarize the jury with every circumstance surrounding the state's obtention of his confession. That's even codified in statute, by statute in Illinois. And that was simply violated here when the court said you cannot explain a word about the main interrogation, even though it affects why you confessed in July. The court also said that he could not even say why he confessed in July. He could not even say that when Detective Swiderich brought him back to the same room in July, he said, remember what you told us last time. Oscar was not allowed to testify to that. He was not allowed to say that the detective told him, remember when you walked out of here last time, remember everything was cool? Oscar was not allowed to testify to any of that. And he subsequently didn't testify. Because he had... He said that at the trial. He said to the court, I'm not going to testify based on your ruling. Or just to that effect. Yes, exactly. Because he was not allowed to testify as to why he confessed. The bottom line is that if the detectives hadn't violated Oscar's rights in May, he would never have given this confession, and they shouldn't be allowed to profit from their own misconduct in this case. Oscar's confession should not have been admitted at trial, but at a minimum, the trial court had a responsibility to allow him to explain why he confessed, and not allow him even this basic right. This court should reverse and remand for a new trial. Thank you, Mr. Moran. Thank you. May it please the court, once again, Assistant State's Attorney Peter Maltese on behalf of the people. Defendant was convicted following a fair trial. He was never precluded from testifying. And his reason for testifying, as stated today, of a mid-trial decision is a mischaracterization of the entire issue, which was litigated for an entire year before trial. The defendant had originally filed... She did change her ruling, didn't she? No, her rulings were always consistent. Her rulings were that after the suppression of his May statement, the May statement which included several exculpatory statements, that it wasn't going to be allowed in. She constantly left open the possibility that the defendant would focus on which statements he wants in, because clearly, exculpatory statements, prior exculpatory statements, with him testifying, this was involuntary, I didn't do it, would in fact be hearsay, would be offered for the truth of the matter asserted. Well, what about the statements of the detectives? What they said to him, how are those hearsay when they're not being offered for the truth of the matter? She kind of banned everything. Now, why wouldn't he be allowed to testify that his statement was based on previous statements the detectives made in May where they said the following? What the detectives said would not be offered for the truth, but to show to the jury the effect it had on Mr. Flores when he gave that statement. Well, the court wanted to see specifically what statements defense wanted to bring in. Those statements were banned twice. They were banned under his suppression motion and banned under the people's motion in Linda. Constantly, show me the clips, show me the clips. And defense counsel... They refused, didn't they? They refused. They said they didn't want their hands tied, they didn't want to map out the defense. Judge Boyle gave them a second possibility for letting them in. He said, okay, well, before we do anything, if it comes to the point that you are going to bring these statements out, I expect an offer of proof. Defense did not take the first option, did not take the second, instead attempted the third. When the trial began, right on opening statement, violated the motion in Linda multiple times, despite the court sustaining the people's objections multiple times. And the record doesn't even show the extent of the violations, because clearly the parties were talking at once. Well, what were the violations? The ones that are clear... You're talking about opening remarks? Opening statement, yes. What did the lawyer say? The lawyer stated, we'll show you the ingredients of an involuntary confession, how a defendant can make a statement. How a defendant can be locked up for multiple days, which is clearly a reference to the May confession, which was banned under two separate orders, one in response to the defense motion, one in response to the people's motion. No offer of proof before trial, no offer of proof during trial. And in fact, when the court was attempting to sustain the people's objection, the record shows sustained, sustained, sustained objection, with nothing being said, which clearly indicates that counsel was ignoring the evidentiary rules as they were being stated. And first witness gets up, formal ASA Fred Shepard. Again, a violation of motions eliminated during cross-examination, when counsel, defense counsel, that is, is referencing the May statement. No offer of proof before trial, no offer of proof at trial. Let's focus on the main issue that the defendant is raising here, and that is, that he is a defendant. He is a defendant. He invoked the right to silence. When he said this, after he's advised by the detective about his rights, it said to him, we wanted to talk to you about that. You want to talk to us about that, Mr. Flores? No. Oh, I'm sorry. Not really. No. And in fact, that's what the transcripts say. Not really, no. What does no mean? Does it no mean no or no? Well, not really, no. Not really, no. Does that mean no? Are we going to rewrite the books here? No, no, but the no has to be looked upon in the context of the conversation. Well, in another case, People v. Brown, the defendant is a defendant. He's a defendant. He's a defendant. He's a defendant. And the defendant said no. That was a no. Here we have not really, no. And it was an answer to a very specific question. Do you want to talk about this specific subject matter? The co-defendants, the co-defendants. Shouldn't he really say, understanding your rights, do you wish to talk to us now? He gave the Miranda, you have the right to remain silent. Right, but then shouldn't he say, understanding your rights, do you wish to talk to us now? Isn't that what he should have said? Isn't that kind of what's normally said? Clearly that wasn't said in this point. That does not make it involuntary. No, we're not here to decide at this point. That's another argument that's made by the defendant that this was made in violation of the right to remain silent, that this statement was given after a request for counsel, and that the co-defendant should not make a third argument that the confession is involuntary based upon the entire set of circumstances, including what had happened in May. But right now, I'm just focusing in on not really no. And in reviewing the transcripts, the not really no has to be looked upon as his demeanor, and in the context of the whole case, I think it's exciting for that. The cases say you have to scrupulously honor an invocation of the right to remain silent. You have to scrupulously honor a request for counsel. And I mean, I think not really no probably is definitive on that question. But there's more. The next page, the detective says, well, that's the way it is, but we want to talk to you about this thing. You got anything to say about the gun? Now, in the videotape, at that point, Mr. Flores actually moves his head back and forth horizontally, indicating no. The transcript doesn't reflect that, but the tape does. He's not nodding his head up and down. He's actually shaking it back and forth, indicating no. After that question, you got anything to say about the gun? Then the next question is, you don't know something about the gun? And Mr. Flores says, no. And then a few pages later, so if you're talking about his demeanor or something, later on in that same statement, there's another couple of remarks from the detective, I do that all the time, no big deal, I ain't mad, this is just something I had to do. You know, I'm not going to say anything about the gun, but that's what they pay me to do. You just try to make it look like this, the bad guy here, I want to hear what you got to say about it. Here's Mr. Flores, I ain't got to say nothing about nothing. I ain't got to say nothing about nothing. Is there an indication here that this person doesn't want to talk? It's not an indication that he wants to talk, it's a cutoff questioning. He's asked specific subject matters regarding this offense, and he states, in the one instance, do you know anything about this? No. Do you have anything to say about this? No. At no point... Well, is there some point later where the detective then says, do you want to talk to us in general? Is that question ever asked of him? No. No, the questioning just continues and continues and continues, and it's not an indication that he wants to talk. The questioning continues until he, maybe 45 minutes later after several breaks, makes an incriminating statement. That's correct. None of those statements are unequivocal or unambiguous statements of a desire to cutoff questioning. Well, what case would you cite? What is your best case to say that no doesn't mean no? Cite me a single case in all the cases cited by either side that says no doesn't mean no. Well, in a paper of V. Kronenberg, it was an answer to the question yes. The answer was yes. Do you want to talk to us? Do you want... Are you done talking to me? Are you done talking to us? And the defendant said, yeah. And this court found that that does not rise to a level so unambiguous, so unequivocal an indication of his right to silence. Okay, that was a yeah as opposed to a no, and Kronenberg is actually very different. There's a number of cases where the defendant gave incriminating statements, inculpatory statements, spoke for quite a long period of time, and then after he'd already given an inculpatory statement, he said, I really don't want to talk anymore. Well, he'd already said whatever he was going to say, and Kronenberg is one of those cases, multiple advisement of the rights, and then later he says at some point, yeah, I'm done talking with you. I mean, that's not the situation. This isn't a situation where early on he's asked a question, do you want to talk to us about what this guy has to say, and he says, not really, no. And reviewing the tapes and his demeanor there, he says, no, I don't want to talk to you anymore. He's in a very relaxed mood. He has his hands in the back of his head. He's reclined, and the statement is kind of a lament on his situation there. It's not an unequivocal desire to cut off all questions at that point. Well, the case that you're referring to where they, Kronenberg, they say that. This is not Kronenberg, no matter how you look at it. It's just totally different. Let me ask you this. Your premise is that each of these times when he says, no, well, not really no or no, that's in response to a question about a specific area, as opposed to a general question, do you want to talk to us? I guess I have two questions. First of all, can you make that argument if they never ask him, do you want to talk to us, if they just go right into the specifics and they never get an actual waiver out of them? And two, understanding that your premise is that, well, those are just contextually responses to specific questions. What about, I ain't going to say nothing about nothing. I mean, nothing is nothing. So that's not in response to a specific, you want to talk to me about Masias, you want to talk to me about the gun. This is nothing about nothing. So those are two questions I just gave you. Well, the first question was there was a waiver. First answer to your question. There was a waiver. He was, read his Miranda rights, and after each right, including, you know you have the right to remain silent, do you understand? Yes. But then did he say, do you want to talk to us? Do you want to talk to us now? Understand those rights, do you want to talk to us? Did he ask that? No, he did not ask that. Okay. So he didn't actually waive. He didn't actually say, do you want to talk to us? He just started talking. Is that good enough? He started talking indeed. So that takes care of that? I was asking. But as Judge Boyle found looking at the tapes, in an attempt to give meaning to not really know, he continued to talk. He continued to engage. Okay, but answer my second question. What about, I understand that. So what about this, I ain't going to say nothing about nothing. And they just keep going. So, I mean, isn't that an unequivocal general statement? I'm not going to talk to you about nothing? It is, but he actually continues to talk after that. And while... But Mike, is it, I guess the question really is, when he says, I don't want to talk to you about anything. I took the double negatives out. I don't want to talk to you about nothing. I'm not talking about nothing. Isn't they, aren't they supposed to just stop? Aren't they just supposed to walk out of the room then? Or are they supposed, can they keep going? It's still, it's still not unequivocal. I don't want to talk to you about anything. Anything is not unequivocal. I don't want to talk to you about anything. We're done. We're not done? It's unequivocal in the sense of where it appears in the context. Okay, well, you know what, I want to direct you away from that for one moment. Miranda and then subsequent U.S. Supreme Court cases say, and I'm talking about Mosley now. Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease. Now, that's really the rule. Now, there are cases that say it has to be a clear indication. But to my way of thinking, no means no. But in U.S. v. Smith or Smith v. Illinois, when the Supreme Court had reversed the Illinois Supreme Court for a case involving an invocation of the right to counsel, the court said that an accused post-request responses, which is kind of what you keep hammering on, that he kept answering questions, that he kept answering questions, he kept responding. In that case, the Supreme Court said you cannot use post-request responses to further interrogation. You cannot use them to cast what they called retrospective doubt on the clarity of the initial request itself. So if this is clear, if he said not really no, and if we interpret no to mean no, we should not look at his continuing responses to questions. They just kept questioning him. He sat there. Sometimes there was a pause. In fact, there's about 50 pauses in the videotape that are not transcribed. Normally, the reporter would put in, you know, a pause. But in this case, the reporter put in a pause. But there are multiple pauses. The point is, is that he did continue to answer questions. Human nature tells us that if somebody asks you a question, you normally respond. It's just a natural response. That's human nature. But that doesn't mean that he didn't tell those detectives in no uncertain terms that he didn't want to talk to them. Well, in response to the holding in Smith, over here, no, not really no, is not a definitive statement. It's in the context of a very specific statement, a very specific question, immediately after full Miranda rights. Equally without merit is the defendant's statement that he invoked his right to counsel at that time. It's clear on the record, he was talking about the state's attorney. It's clear on the record that the defendant knew the difference between a state's attorney and his counsel. Do we take into account, as Ms. Moran is arguing, that the backdrop that these detectives, that they did the same thing, he asked for a lawyer. They just ignored it. They just kept going. They kept asking questions. Should we consider this as we look at what happened in July before any court intervention of any kind? The detectives, one of them was the same. He was in there before. He was in there before. They didn't stop. So should we look at that in light of his continuing responses, that he knew that no matter what he said or did, they were going to keep talking to him and there was nothing really he could do about it? Well, in May, that's not quite what happened. What happened was he invoked his right to counsel, questioned and stopped for a fairly long period of time, and the detectives reinitiated. Yes, but were they allowed to do that without bringing in a lawyer? I don't think so. No, no. I'm not here to justify their actions in May, but in response to your question, did the same thing occur in July? And that's absolutely not. The same thing did not occur in July. The defendant's entire posturing, I mean, the entire interactions in July regarding discussions of an attorney and the one in May are completely different. And it's different because, first of all, he's talking about the state's attorney's office. When is the attorney going to come? The detective says, do you mean the state's attorney? Yes. Then he asks for clarification of his right to counsel. Isn't it true you said that if I ask for an attorney, you have to stop talking, which is very true, but he said in May. However, in May, the detective, in both situations, the detective began to answer the question. In May, the detective answered the question, yes, it's true. And if you want an attorney, we're going to stop. And he did stop. Admittedly, improperly reinitiated 15 hours later. But in July, as he's about to explain this, the defendant started asking more questions, stopped him in his tracks, and said, I'm going to stop. And that's the 48-hour rule. Similar to my response on the right to silence, but stronger in that defendant is continuing the conversation and not stopping for counsel. What about when he's nodding his head no? What's your response to that? The detective says, do you want to talk to us about the gun? And he nods his head no. The videotape shows that. Well, clearly Cronenberg was saying, which talked about two different instances of alleged invocation of right to silence. The first one was simply based on his mannerisms. And this court has held that mannerisms aren't enough. Mannerisms can be very ambiguous. Yeah. Well, this one is we've got not really no. Then we have a head moving back and forth horizontally indicating no. We've got then an actual audible response, no. And then finally we wrap it up with I ain't going to say anything about anything. However you want to phrase it. So these are all you're saying manifestations of a willingness to talk. Is that really your argument? Yes. And it shows an absence of a desire to cut off questioning. All right. Why don't you go ahead and wrap it up? Okay. The July statement that we've been discussing was never entered into evidence. What was entered into evidence was the assistant state attorney. And the defendant was never precluded from testifying to anything regarding July testimony. Let me ask you this. If we are to agree with the defendant that he invoked his right to remain silent and we have to reach the issue of the statement to the state's attorney, what do you believe the test is for us to apply? Let's just take that as a hypothetical. We throw out the statement because he invoked his right to remain silent. How do we determine whether or not to permit him to speak? How do we determine whether or not to permit him to speak? And what is the subsequent statement that was taken after a specific right to remain silent? The fresh Miranda rights were given. The defendant made every indication that he understood those rights. There was a passage of time of four hours. It was a different interviewer. And the defendant was not in the process of speaking. The defendant was not in the process of speaking. The alleged violation was something that wasn't so outrageous. It was failing to respond to an ambiguous question. Failing to respond to an ambiguous invocation. Additionally, although the confession is a strong piece of evidence, there was in fact an eyewitness identification of him as a shooter in this case. And although that was recanted at trial, his prior grand jury statements were presented as substantive evidence. And under section 110, I'm sorry, section 115-10.1, it says that the defendant, in this case, independently of his confession, his confession that was entered, was brought in without any violations whatsoever. And this court should affirm defendant's convictions. I have two points on rebuttal. The first is in response to the state's contention that Oscar only invoked his right, it was a quote, very specific invocation of his right. And there are a lot of problems with that argument, which I think your honors have adequately questioned the state on. But what I would like to point out is even if he did only invoke a very, it was only a very specific invocation, Detective Swideric still violated that specific invocation by questioning Oscar's right to remain silent. And that is at the beginning when Oscar says, when Detective Swideric says, do you want to talk to us about what Macias is saying, Oscar says not really no. And even accepting the state's position that that was a specific invocation, Detective Swideric then immediately goes on to talk about what Macias was saying. So that's exactly what Oscar had just invoked his right to silence about. So the state's conviction says that. And even if it was a specific invocation... Is there some authority for the fact that we should consider the invocation of right to silence with regard to specific subjects? No, there's not, your honor. And we're not asking this Court to do that. But just taking the state's argument on its face, it still doesn't accomplish anything, because Swideric violated that particular invocation, even if there was authority on the matter. Well, and throughout the statement, that's really all that the detective talks about, is we want you to tell us about what is your response to what he said about you. He probably says that 20 times. Yes, repeatedly, your honor. And the second, I'd just like to clarify your honor, Justice McBride's question earlier. I did, I did, I think, misunderstand your question. So the test is not what I was talking about in Kalikowski, so I apologize for that. The test is the Nielsen factors, also addressed in People v. Hernandez. And they are? It's a four-factor test. The first is whether the police immediately halt the interrogation. That's not satisfied here. The second is whether a significant amount of time elapsed. In this case, that's not satisfied, because Swideric continues. There are repeated further interrogations by Swideric, and only a few hours later, the ASA shows up. The third is whether a fresh set of Miranda warnings is given. That is, ASA Shepard did satisfy that particular requirement. And the fourth is whether the interrogation involved the same crime. At best, one of the factors is in favor of the state. But this court in Hernandez held that if the first factor is not satisfied, then it's done. That's the only thing, then it's automatically in the defendant's favor. So in this case, there really shouldn't be any questions. Well, there's four factors, and those, I believe, are what you just indicated as opposed to what was said earlier, and of course, the state's response was to that. But in any event. I think we understand the test. Any other questions? No. All right. Well, thank you very much. We appreciate, the court appreciates the excellent presentation and briefing, and we will take the matter under advice. Court's adjourned. Thank you.